[Cite as *In re T.M.*, 2014-Ohio-1131.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | | |

IN RE: T.M.

C.A. No.      13CA0043


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.      11-1760-AND

DECISION AND JOURNAL ENTRY

Dated: March 24, 2014

WHITMORE, Judge.

{¶1}    Appellant, Leisa Ritzi, appeals from the judgment of the Wayne County Court of Common Pleas, Juvenile Division, that denied her motion for legal custody of T.M. and granted the motion of the Wayne County Children Services Board ("CSB") for permanent custody of the child.  This Court affirms.

I.

{¶2}    T.M. was born to Hillery Y. ("Mother") and Louis M. Jr., ("Father") on August 29, 2008.  From the beginning of their child's life, both parents suffered from substance abuse and had difficulty providing for their child's needs.  Leisa Ritzi, the child's paternal grandmother ("Grandmother"), often assisted with needed supplies, food, and child care.  In time, the parents separated.  Father moved in with the child's great-grandparents, Connie and Cecil Wolfe, while Mother and T.M. moved in with her parents.  Problems with substance abuse and providing for

the child's needs persisted. On August 29, 2011, CSB filed a complaint in juvenile court, alleging that T.M. was neglected and dependent.

{¶3} At the initial shelter care hearing, the juvenile court magistrate ordered the child into the custody of the agency. Also, at that time, Dawn Durkee, the agency caseworker assigned to the task of conducting relative home studies, began the process of attempting to locate a relative placement for the child. As part of that process, she interviewed the parents and asked them for placement recommendations. Father recommended placement with his father ("Grandfather"), while Mother recommended placement with Grandmother. These two individuals were the previously married and now divorced parents of Father. The couple's relationship appears to have been acrimonious during much of their married life and since then.

{¶4} Ms. Durkee inquired of the two individuals recommended by the parents for placement of T.M. Grandfather expressed willingness to accept placement of T.M., while Grandmother was willing, but unable. Instead, she recommended her mother and stepfather, Connie and Cecil Wolfe, as caregivers. Ms. Durkee began the investigation protocol as to Grandfather and the Wolfes, and considered their criminal histories, child welfare histories, fingerprints, home inspections, personal interviews, and medical and financial reports.

{¶5} In the meantime, the trial court continued the shelter care hearing for ten days. At that point, CSB's position was to oppose placement with the Wolfes. Ms. Durkee later explained that there had been many domestic disturbances at the Wolfes' home during their ten years of marriage, some of which involved Father, and the agency did not believe that was the kind of environment the child should be in. Nevertheless, against the recommendation of CSB, the magistrate ordered that T.M. should be placed with Mr. and Mrs. Wolfe.

**{¶6}** On November 14, 2011, T.M. was adjudicated dependent and was placed in the temporary custody of the agency. T.M. remained with the Wolfes, pursuant to court order. The court adopted a case plan that addressed substance abuse, parenting skills, mental health, stable housing, and employment or income for both parents.

**{¶7}** Ms. Durkee explained that, when a placement is made by the court with which the agency disagrees, the agency will review that placement at six-month intervals. *See* Ohio Adm.Code 5101:2-42-18(H). In May 2012, the agency reassessed the Wolfe home and continued its opposition to the placement. The agency reiterated that the couple has a history of domestic disputes involving the local police department. Some of those disputes involved Father. Some of the calls to the police were made by Grandmother. The agency also reported that Mr. Wolfe, who is in his 70s, was uncertain whether he wanted to be involved in long-term parenting of this young child. The caseworker reported that the couple argues "over almost every conceivable topic," including childcare issues of discipline, sleep routines, diet, and potty training.

**{¶8}** Following the agency's negative reassessment of the Wolfe home, the on-going caseworker prepared a motion to change T.M.'s placement. Thereupon, Ms. Durkee reengaged her home study regarding Grandfather and, at Grandmother's request, initiated a home study for her also. In the end, Grandfather's home study was approved, but Grandmother's was not.

**{¶9}** It had become apparent that neither parent was making satisfactory progress on their case plan requirements. Accordingly, the agency moved for permanent custody on July 24, 2012. Grandmother moved for legal custody on September 26, 2012. Also, in September 2012, T.M. was moved from the Wolfes' home to Grandfather's home.

{¶10} A four-day hearing was conducted on both motions as well as a review of the child's current placement. On the first day of the hearing, Mother voluntarily surrendered her parental rights. Subsequently, Father testified that he was requesting that his parental rights not be terminated, but that the court grant legal custody to Grandmother. He explained that he was not able to provide a stable home for the child.

{¶11} At the conclusion of the hearing, the trial court found that Mother surrendered her parental rights, both parents abandoned the child, the child could not be placed with either parent within a reasonable time or should not be placed with either parent, and it was in the best interest of the child to be placed in the permanent custody of the agency. Consequently, the trial judge denied Grandmother's motion for legal custody and granted the agency's motion for permanent custody.

{¶12} Neither parent has appealed from the judgment of the trial court. Grandmother has appealed and has assigned one error for review.

II.

**ASSIGNMENT OF ERROR**

THE JUVENILE COURT'S DECISION TO AWARD PERMANENT CUSTODY TO THE WAYNE COUNTY CHILDREN SERVICES BOARD WAS AGAINST THE MANIFEST [WEIGHT] OF THE EVIDENCE.

{¶13} In her sole assignment of error, Grandmother has argued that the trial court's determination that permanent custody was in the best interest of the child was in error because the manifest weight of the evidence supported placement of the child in her legal custody. For the reasons set forth below, we conclude that the trial court did not err in granting CSB's motion for permanent custody or in denying Grandmother's motion for legal custody.

{¶14} In reviewing a challenge to the weight of the evidence, this Court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice. *See In re M.C.,* 9th Dist. Summit No. 24797, 2009-Ohio-5544, ¶ 8 and ¶ 17. *See also Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

{¶15} An order granting permanent custody of a child to a proper moving agency requires clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 97-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb,* 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶16} The trial court found that the first prong of the permanent custody test was satisfied because Mother voluntarily surrendered her parental rights to the child, both parents had abandoned him, and the child could not be placed with either parent within a reasonable time or should not be placed with either parent. *See* R.C. 2151.414(B)(1)(a) and (B)(1)(b), and R.C. 2151.011(C). In support of the finding that the child could not or should not be placed with either parent, the trial court cited Father's severe chemical dependency and his lack of

commitment to the child. *See* R.C. 2151.414(E)(2) and R.C. 2151.414(E)(4). There is no challenge to the trial court finding on this prong of the permanent custody test. Regarding the second prong, the trial court found that an award of permanent custody was in the best interest of the child, and also specifically found that an award of legal custody to Grandmother was not in the child's best interest. *See* R.C. 2151.414(B)(1). Grandmother challenges this finding on appeal.

{¶17} Because the trial court's decision to deny Grandmother's motion for legal custody hinges on the best interest of the child, this Court "typically conducts a single 'best interest' review of the trial court's decision to place the child in the permanent custody of the agency rather than in the legal custody to a relative." *In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10. If permanent custody is in the child's best interest, legal custody with Grandmother necessarily is not. See *id.* Consequently, in reviewing the best interest determination by the trial court, we will review the relevant factors, including those set forth in R.C. 2151.414(D)(1): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, and the child's need for permanence in his or her life. R.C. 2151.414(D).

{¶18} T.M.'s relationship with his parents was limited by the fact that each parent had a significant history of substance abuse, resulting in sporadic visits and few opportunities for positive interactions.

{¶19} Grandmother frequently provided care-giving and financial support to T.M. and his parents during the three years before CSB became involved and during the year the child was placed with the Wolfes. Grandmother has not visited with T.M. while he has been placed with Grandfather, but the record demonstrates that Grandmother was very involved with the child for

four years. The trial court had additional evidence before it, however, that tended to raise doubts about Grandmother's ability to safely and securely provide care for a young child.

{¶20} First, CSB's home study of Grandmother, conducted in the summer of 2012, was denied. While Grandmother had no criminal or children services history, the report indicated that her home lacked sufficient stability due to multiple incidents in which there was a risk of harm to Grandmother or her family. The agency found that Grandmother made choices that continued to place her and her family at risk and she failed to take measures that would have been more protective. The agency also expressed concern with several misrepresentations of factual information during the interview process. The report explained that the agency must rely on caregivers of children to share accurate information for the protection and well-being of children placed in their homes.

{¶21} As examples of misrepresentations in this case, Ms. Durkee cited: (1) Grandmother's varied references to her fractured arm as either an accident or intentional by her son, as further explained below; (2) her statement denying recent contact with her son when telephone records established that she had recent contact with him; and (3) her assertion that Grandfather paid no attention to his children when he was actually vacationing with his daughter at the time. Ms. Durkee explained that the agency's concern is not so much with the substance of the matters that were misrepresented as with the possibility that the potential custodian may misrepresent other matters regarding a child placed in the home.

{¶22} Second, Grandmother has close personal relationships with others who have contributed to the chaos and tumult in her life. Those people include her son, her mother and step-father, and two ex-husbands. Regarding her son, Grandmother's relationship with him has been conflicted. She loves him and has provided him with financial support and a home at times,

but there has also been turmoil between them. For example, Grandmother testified that she contacted the police several times about her son being violent towards her while he was a juvenile. In addition, during a shared car ride, Grandmother's arm was fractured by her son. Grandmother has variously described her son's actions as intentional and accidental. She did not file a police report following the incident, but her son soon moved out of her home. Furthermore, in telling Ms. Durkee the last time she saw her son, Grandmother was said to have turned to her fiancé, George, and said, "[O]f course, George would not want me around [my son] after he did that (broke my arm) to me." At the time, Grandmother did not describe the fractured arm as an accident. Ms. Durkee felt Grandmother was being untruthful in the presence of her fiancé, and was, therefore, building another unhealthy relationship.

{¶23} Father also displayed his anger in the presence of the ongoing CSB caseworker, Martha Jackson-Hill. Ms. Jackson-Hill testified that Father loudly carried on at the visitation center and claimed that he "slugged" his mother so hard that her arm was broken. The same caseworker testified to being terrified by Father during a visit at Grandmother's home just one month before the final dispositional hearing and after Father had completed an anger management course. She described Father as yelling, cursing, waving his hands, and calling her racially derogatory names.

{¶24} In addition, Grandmother has a close relationship with her mother and step-father, Connie and Cecil Wolfe, whom she recommended as caregivers for T.M. There was evidence before the trial court that was critical of the quality of care provided by the Wolfes to T.M. and particularly critical as to the stability of that home. In her judgment entry, the trial judge noted the numerous police reports taken when law enforcement responded to calls for domestic

disputes and/or violence between Connie and Cecil Wolfe at their home, including the fact that Grandmother initiated some of the calls for assistance.[1]

{¶25} Lastly, Grandmother had two marriages that she herself describes as turbulent and violent. Her second marriage to Christopher Ritzi lasted 16 years, from 1995 to 2011, despite the fact that Grandmother described him as being physically assaultive throughout most of the marriage and stating that she feared for her life while she was with him. Police were called to the home in June 2002 for domestic violence. Grandmother obtained a no contact order against Mr. Ritzi in 2005. Father added the fact that Mr. Ritzi once broke Grandmother's nose. Grandmother separated from Mr. Ritzi in 2009 or 2010, and they were finally divorced in September 2011.

{¶26} Grandmother's first marriage was to Grandfather, T.M.'s current caregiver, and lasted from 1987 to 1994. Grandmother testified that he was abusive and controlling, and that he got physical with her several times. Grandmother also claimed that Grandfather was not a good father to their children and that he failed to assist T.M. and his parents during the early years. The couple's two grown children generally corroborated Grandmother's testimony, although their son, Father, told Ms. Durkee that he would like T.M. to be placed with Grandfather at the beginning of the case, and their daughter admitted she loved her father and communicated regularly with him on Facebook.

{¶27} For his part, Grandfather and his second wife have been married for 14 years. They have no children together, but Grandfather helped raise his wife's two boys through their

---

[1] This finding was made by Judge Latecia E. Wiles who was appointed as the new Wayne County Juvenile Court Judge in the midst of this case and heard the matter from April 2012 forward.

teen years. Those boys are now grown and one of them testified to considering Grandfather as his father and having a "big brother" relationship with T.M. Grandfather testified that he is dedicated to providing a safe and secure home to T.M. and maintains that the child has done well in his home for the last eight months. He admits to making mistakes in his marriage to Grandmother, but he generally had a different view of their married life. He denies ever striking Grandmother, though he admits putting a hole in a wall, and denies being abusive to his children. He claims that his truck-driving job and military career often kept him away from his children during their early years, and that he returned to Ohio in 2006 to attempt to repair and improve those relationships. In particular, he pointed to financial assistance to help his son pay for drug rehabilitation programs and a graduation trip to California with his daughter. Grandfather used his military opportunities to obtain a bachelor's and master's degree.

{¶28} Grandfather's home study revealed no criminal or children services history. The agency looked into Grandmother's claims of violent behavior by Grandfather during their marriage, but found no documentation to validate them. Grandmother claims that there are no records of police calls to the house because the old microfiche records no longer exist. Nonetheless, there is no evidence of convictions in the record. According to the CSB caseworker, Grandfather's home appears to be stable, and she noted that the couple worked through some non-violent marital difficulties with the aid of counseling. The agency's home study of Grandfather approved him for temporary custody placement. Grandfather and his wife have stated that they would be interested in adoption if permanent custody is granted.

{¶29} It may be noted that some of the chaos in Grandmother's life involved Grandfather. CSB compared how the two responded to their personal problems. The caseworker distinguished Grandfather's behavior by the fact that he admitted to past difficulties,

sought counseling, and made positive changes in his life that resulted in a generally stable situation, whereas Grandmother has not admitted to failings, has failed to protect herself and those around her from risks of harm, and has continued to have violence and chaos in her life. Grandmother claims she did not cause the problem in these situations and that she was the victim. There is no evidence that Grandmother has sought counseling or taken steps to address her admitted victimization. Moreover, Ms. Durkee questions whether Grandmother is embarking on another unhealthy relationship based on comments she made to her fiancé.

{¶30} The wishes of this young child were expressed by the guardian ad litem. She recommended an award of permanent custody to CSB as she believed that would be in the best interest of the child. She explained that the parents have had little contact with the child since early 2012 and neither is in compliance with their case plan obligations. T.M. is doing well in his current placement and his caregivers are interested in adoption if that option should become available.

{¶31} The guardian ad litem further explained that she opposed an award of legal custody because it would open up all of the contentious conversations and the animosity expressed over three days of hearings in court. In particular, she did not believe it was in T.M.'s best interest to be placed in the legal custody of Grandmother due to her history of domestic violence and abuse. She did not believe that was a safe environment for the child. In support of her opinion, she cited the denial of Grandmother's home study by CSB. She testified that after hearing three days of testimony, she was more certain of her recommendation than before.

{¶32} The third best interest factor calls for consideration of the custodial history of the child. T.M. resided with both parents or just with Mother for the first three years of his life. After his removal from Mother's home, T.M. was placed with the Wolfes for one year.

Following a reassessment of that home, T.M. was removed and placed with Grandfather and his wife. T.M. resided there for approximately eight months at the time of the dispositional hearing, and he is reported to be doing well in their care.

{¶33} As to the fourth best interest factor, Caseworker Jackson-Hill testified that the child needs permanency and should be adopted by someone who is stable, responsible, has a genuine connection to him, and will be there to help him. She believes T.M. is currently doing well because he has consistency in his life and feels safe and secure. He is enrolled in Head Start and is in family counseling. Ms. Jackson-Hill believes that if Grandmother were given legal custody the "drama" of her life would continue and that would not be in the child's best interest. She also explained that Grandfather prefers to seek adoption rather than legal custody because of the adversarial relationships between family members over the years.

{¶34} Upon consideration, the record demonstrates that there was ample evidence before the trial court from which it could conclude that permanent custody to CSB, and not legal custody to Grandmother, was in T.M.'s best interest. The record does not support a conclusion that the trial court clearly lost its way and created a manifest miscarriage of justice. Consequently, the trial court did not err in denying Grandmother's motion for legal custody, in terminating the parents' parental rights, and in placing T.M. in the permanent custody of CSB. Grandmother's sole assignment of error is overruled.

{¶35} As a final point, this Court emphasizes that this case addresses only with the question of whether permanent custody is in the best interest of the child. The issue of adoption was not before the trial court and is not before this Court. That is a separate matter for another day.

III.

{¶36} Grandmother's assignment of error is overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

HENSAL, P. J.
CONCURS.

CARR, J.
<u>CONCURRING IN JUDGMENT ONLY.</u>

{¶37} Although I agree that the trial court did not err in granting CSB permanent custody of T.M., I would not discuss placement with Grandfather as compared to Grandmother. The issue is not whether placement with Grandfather is better than with Grandmother. The issue is whether permanent custody is in T.M.'s best interest.

<u>APPEARANCES:</u>

ROSEANNE K. SHRINER, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and NATHAN R. SHAKER, Assistant Prosecuting Attorney, for Appellee.

REBECCA A. CLARK, Attorney at Law, for Appellee.

MICHELE SHERRIN, Attorney at Law, for Appellee.

LYNN BEAUMONT, Attorney at Law, for Appellee.

KAREN WIEST, Guardian ad litem.