[Cite as *In re E.E.D.*, 2022-Ohio-4014.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE E.E.D.,

Minor Child

[Appeal by J.L.T.]

:
:
:
:
:
:

No. 111352

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 10, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD19914310

---

***Appearances:***

Carolyn Kaye Ranke, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Rachel Eisenberg and Joseph C. Young, Assistant Prosecuting Attorneys, *for appellee.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Appellant J.L.T., maternal great-aunt and former legal custodian of E.E.D., appeals from the decision of the Cuyahoga County Court of Common Pleas, Juvenile Division (the "juvenile court"), that terminated her rights as legal custodian of E.E.D., terminated the parental rights of E.L., mother of E.E.D. ("Mother"), and

J.F., father of E.E.D. ("Father"), and granted permanent custody of E.E.D. to appellee the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). For the reasons that follow, we affirm.

**Factual Background and Procedural History**

{¶ 2} On August 18, 2010, J.L.T. was granted legal custody of her great-niece, E.E.D. (d.o.b. September 3, 2006), after the child's parents abandoned her. *See* Cuyahoga J.C. No. CU09118219. E.E.D. had been living with J.L.T. since April 2009.

{¶ 3} On November 26, 2019, E.E.D., who was then 13, was removed from the home she shared with J.L.T. following a domestic violence incident involving J.L.T. and E.E.D. The following day, CCDCFS filed a complaint for dependency and temporary custody of E.E.D. along with a motion for predispositional temporary custody. The complaint alleged that E.E.D. had mental health needs that required medication and therapy, that J.L.T. was unable to ensure that those mental health needs were being met and that J.L.T. was unable to "safely maintain" E.E.D. in the home due to "significant conflict in the home" between E.E.D. and J.L.T. The complaint further alleged, as to Mother and Father, that E.E.D. had been "judicially determined to be abandoned" by her parents in 2010, that Father had not contacted or visited E.E.D. in over a year and that Mother resided out-of-state, had not contacted E.E.D. for two months and had not visited with E.E.D. in over a year.

**{¶ 4}** J.L.T. denied the allegations of the complaint. On November 27, 2019, the magistrate granted the agency's motion for predispositional temporary custody and committed E.E.D. to the emergency temporary custody of the agency.

**{¶ 5}** On December 18, 2019, a Cuyahoga County Grand Jury indicted J.L.T. on three counts of endangering children and one count of domestic violence in connection with the November 2019 domestic violence incident involving E.E.D. (the "criminal case"). As a condition of her bond, J.L.T. was ordered to have no contact with E.E.D. The no-contact order was in place from until January 3, 2020 until October 6, 2020 when the trial court handling the criminal case "lifted" it.

**{¶ 6}** A temporary custody hearing was held on February 18, 2020. J.L.T. and Mother did not attend the hearing, but Father attended the hearing. The agency was granted leave to file an amended complaint at that time and with no objection. As it relates to J.L.T., the amended complaint alleged:

1. The child has been in the legal custody of [J.L.T.] since 2010. See Case CU09118219.

2. The child has mental health needs that require medication and therapy. Legal custodian has been unable to manage the child's mental health needs.

3. There is significant conflict in the home between legal custodian and the child. As a result, legal custodian cannot currently maintain the child in the home.

\* \* \*

Reasonable efforts were made by the Cuyahoga County Division of Children and Family Services to prevent the removal of the child from the home and removal is in the best interest of the child.

{¶ 7} At the conclusion of the hearing, the juvenile court found that the allegations of the amended complaint had been proven by clear and convincing evidence and adjudicated E.E.D. to be dependent. The parties agreed to proceed immediately to disposition. The juvenile court found that E.E.D.'s continued residence in, or return to, the home of her parents or legal custodian would be contrary to her best interest and committed her to the temporary custody of the agency.

{¶ 8} The agency submitted a case plan which the juvenile court approved. As it relates to J.L.T., the case plan required J.L.T. to attend, and actively participate in, family therapy with E.E.D., that J.L.T. learn different parenting techniques from family therapy services and that J.L.T. demonstrate better coping skills while parenting E.E.D. As it relates to Father, the case plan required Father to develop and maintain a relationship with his daughter and to maintain sobriety, submit to random drug screens and undergo a drug and alcohol assessment and treatment, if necessary. Mother was not included in the case plan. The stated permanency goal of the case plan was reunification with J.L.T.

{¶ 9} On October 5, 2020, the state filed a motion for a first extension of temporary custody. The state indicated that E.E.D. had completed an assessment and was engaged in counseling services. The state further indicated that J.L.T. had, at that time, been unable to participate in counseling services with E.E.D. due to the no-contact order in the criminal case, but that it was anticipated that the criminal case would be resolved within the next six months and that E.E.D. could be reunified

with J.L.T. if J.L.T. "achieve[d] the remaining objectives of the case plan." The state indicated that Father had started to develop a relationship with E.E.D. but that he had relapsed and, thereafter, had not been visiting with E.E.D. or engaging in services. The juvenile court granted the motion for extension of temporary custody.

{¶ 10} On October 6, 2020, J.L.T. pled guilty to an amended count of domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor, and an amended count of endangering children in violation of R.C. 2919.22(A), a first-degree misdemeanor, in connection with the November 2019 domestic violence incident against E.E.D. The trial court sentenced J.L.T. to one year of probation and lifted the no-contact order.

{¶ 11} On May 13, 2021, the agency filed a motion to modify temporary custody to permanent custody pursuant to R.C. 21512.414(B)(1)(a)-(b), (d), (D)(1) and (E). On January 19, 2022, the juvenile court held a hearing on the agency's motion (the "permanent custody hearing").

{¶ 12} The agency argued that it should be awarded permanent custody of E.E.D. because she had been in the custody of the agency since November 2019, her parents and J.L.T. had failed to complete the objectives of the case plan, E.E.D. could not or should not be placed with her parents or J.L.T. within a reasonable time, alternative relative placement had been investigated and there were no adequate, willing and able relatives with whom to place E.E.D. and permanent custody was in E.E.D.'s best interest due to her need for permanency and stability.

{¶ 13} J.L.T. argued that the juvenile court should deny the agency's motion for permanent custody because she had been E.E.D.'s legal custodian for most of E.E.D.'s life and wanted E.E.D. to return home. Although acknowledging that there had been a break in communication due to E.E.D.'s mental health issues and that, at times, their interaction had been "difficult and aggressive," J.L.T. asserted that the agency had made no effort to engage E.E.D. and J.L.T. in family counseling to address the issues needed for reunification and had only partly addressed E.E.D.'s multiple mental health issues. J.L.T. maintained that E.E.D. could be appropriately returned to her care and custody "if actual services to address these concerns were put in place" and asserted that the fact that E.E.D. did not wish to return home should not control in determining what was in her best interest. At the time of the hearing, E.E.D. was 15 years old.

{¶ 14} Charlene Hill ("Hill"), a CCDCFS childcare specialist, Hannah Shaeb ("Shaeb"), a Community Risk Manager and Network Advocate for Grace Haven, and J.L.T. testified at the hearing.

{¶ 15} Hill was assigned to the case in August 2021. She testified regarding the circumstances that led to E.E.D.'s placement with J.L.T. in 2010, the removal of E.E.D. from J.L.T.'s care following the November 2019 domestic violence incident[1]

---

[1] Although there was no testimony regarding the specific facts that led to E.E.D.'s removal from her home in November 2019, on cross-examination, J.L.T.'s counsel questioned Hill regarding a CCDCFS activity log, which described the incident as follows and which Hill confirmed was the "starting point" for the agency's involvement in November 2019:

and J.L.T.'s subsequent criminal convictions for domestic violence and child endangering. Hill testified that when J.L.T. was charged in November 2019, the agency learned (based on allegations set forth in the indictment in the criminal case) that J.L.T. had been previously convicted of assault with domestic violence in Kentucky in 2015.[2]

{¶ 16} Hill testified that since November 2019, E.E.D. had been in three placements. At first, E.E.D. was placed in a foster home in Toledo. Hill stated that E.E.D. "went AWOL" from that foster home and that there was a concern that, while

---

The current allegations state that they were arguing with [sic] the girl's cell phone, and she was acting up at school. Aunt became upset and began choking her. [E.E.D.] had scratches on her neck. The aunt said they argued and [E.E.D.] flinched at her, and aunt attempted to hit her, but [E.E.D.] covered herself up, then went into the kitchen and got a paper towel and called 911. Aunt called her son to intervene. The uncle stated the girl is known to scratch herself to make it look like someone else did it. [E.E.D.] has also called DCFS before. There are ongoing issues. [E.E.D.] also said the aunt said that she was going to kill her. During the investigation, it was founded [sic] that there is a lot of conflict between the child and her maternal great-aunt. The child has a lot of unruly behaviors that include fights at school and multiple school suspensions. The child attends Walton Elementary and is in the eighth grade. She does not have an IEP. The child also does not comply with mental health services. She's been diagnosed with bi-polar in the past but does not comply with medication. The child is currently not taking any medication or participating in any services. Child reports that her aunt did grab her by the neck and she did choke her. The aunt denies that she physically assaulted the child however, there is a pending DV investigation. A staffing was held on November 26th and [emergency custody] was the decision. During the staffing both [J.L.T.] and the child reported being fearful of each other. * * *

[2] It is unclear from the record exactly what led to this alleged prior conviction. J.L.T. testified that there was an incident at her son's home involving E.E.D., a granddaughter and another child in which a "little bag" was placed in the child's mouth. J.L.T. stated that she "was not declared guilty of anything" in connection with the incident and that she simply paid a fine because "the neighbors around there heard the noises and they called the police."

AWOL, E.E.D. had been exposed to "trafficking." Hill testified that in March 2021, E.E.D. attempted suicide and was then placed in the Village Network, a residential facility for children with severe mental health or behavioral issues. Hill stated that while she was at the Village Network, E.E.D. attempted suicide a second time after a telephone call with J.L.T. In October 2021, E.E.D. was placed in her current placement, another foster home.

{¶ 17} Hill stated that she was unaware if E.E.D. had any specific mental health diagnoses before entering the Village Network but noted that there were "definitely mental health concerns" with E.E.D. before she was placed in temporary custody of the agency. She stated that, while in temporary custody, E.E.D. received treatment for mental health issues both at the Village Network and through Grace Haven, which provides counseling services for children who have been exposed to trafficking. Hill could not recall E.E.D.'s current diagnoses but believed that they included diagnoses for anxiety and depression.

{¶ 18} Hill testified that the agency became involved in this case due to concerns of abuse, concerns regarding E.E.D.'s safety and concerns for E.E.D.'s mental health. Hill stated that, initially, the goal was to reunify E.E.D. with J.L.T. and that the case plan included family counseling so that J.L.T. could get a better understanding of E.E.D.'s mental health and improve their relationship. Hill testified that, despite the case plan, J.L.T. had been unable to participate in family counseling with E.E.D., at first, because of the no-contact order and later because neither E.E.D. nor her counselor felt E.E.D. was "ready" to engage in family

counseling with J.L.T. Hill stated that whenever the issue of family counseling was raised with E.E.D., E.E.D. would become "very emotional," cry and state that "she does not want to do that" and did not want to be in J.L.T.'s care. Based on information she obtained through therapy reports, Hill stated that it was her understanding that E.E.D. had experienced "many difficulties throughout her life due to [J.L.T.'s] physical discipline," that E.E.D. was "struggling to deal with that" and that she was not "mentally prepared to address these concerns that she has with [J.L.T.]." Hill indicated that domestic violence services to address J.L.T.'s behavior were not part of the case plan.

{¶ 19} Hill testified that, to her knowledge, there had been no in-person visitation between J.L.T. and E.E.D. until October 2021, but that, since at least August 2021, J.L.T. and E.E.D. had had regular telephone conversations. Hill stated that there had been difficulties in scheduling visits due to repeated COVID exposures and COVID-related restrictions the Village Network placed on outside visitors and concerns regarding E.E.D.'s mental health.

{¶ 20} Hill recounted a visit that occurred in October 2021 at the Village Network, observing that it "did not go well." Hill stated that J.L.T. and her son had arrived early for the visit and that by the time Hill arrived, E.E.D. was "very upset" and crying and was walking with one of the facility's staff "to help calm herself down." Hill testified that the Village Network staff informed her that J.L.T. and her son had blamed E.E.D. and E.E.D.'s behavior for being in residential placement and told E.E.D. that "if she would just behave herself, she could come home." According

to Hill, E.E.D. told her that she was upset because J.L.T. kept telling her she needed to come home and she was concerned she would be placed with J.L.T. again and did not want to return to J.L.T.'s care. Hill stated that the visit terminated shortly thereafter when E.E.D. asked them to leave.[3]

{¶ 21} Hill testified that she believed E.E.D. and J.L.T. spoke regularly on the telephone and that, in December 2021, E.E.D. and J.L.T. arranged to meet at the McDonald's restaurant where E.E.D. worked. Hill stated that she did not attend the visit but that she understood it went well. She stated that she believed plans had been made for another meeting in January 2022 but that she did not know if that occurred.

{¶ 22} When asked to describe their relationship, Hill testified that when E.E.D. and J.L.T. are together "in public," "with the visits being supervised," they have a "good relationship" and "get along well" but that when J.L.T. "has access" to E.E.D. unsupervised, she becomes "verbally aggressive" with E.E.D. and "blames her for all the things that are going on."

{¶ 23} Hill stated that she had spoken with J.L.T. regarding E.E.D.'s mental health needs and noted that J.L.T. was not understanding of those needs and "felt the child just needed to be with her family." Hill acknowledged that she had never personally witnessed J.L.T. being verbally aggressive with E.E.D.

---

[3] Hill also testified that, at this visit, Mother was on the telephone and told E.E.D. that she had cancer and was dying. It is unclear from the record what, if any, impact that had on E.E.D. and her emotional state that day.

{¶ 24} Hill testified that J.L.T. spoke little English and that, at times, communication with her could be "[a] little bit" difficult due to the language barrier. Hill acknowledged that J.L.T. had attended staffing meetings, that J.L.T. had remained in touch with the agency throughout the case and that J.L.T. had stated on multiple occasions that she wanted E.E.D. back and wanted to engage in family counseling with E.E.D., but that no services had been offered to J.L.T. to accomplish those goals. Hill stated that it was the agency's position that, due to E.E.D.'s mental health, family counseling was "not possible."

{¶ 25} Hill testified that E.E.D. had made significant progress since being placed in her current foster home in October 2021 and that the change in her behavior was like "[n]ight and day." Hill stated that E.E.D. had an IEP for writing and that, previously, there were concerns regarding E.E.D.'s education because she would "miss a lot of school" and was fighting, running away and "causing problems at school." Hill indicated that E.E.D. was now doing "extremely well." She was going to school every day, was getting excellent grades and had no disciplinary issues. Hill stated that E.E.D. now has a job, a savings account and a "good relationship" with both her foster parents and other children in the home — which had not been the case in prior placements. Hill stated that E.E.D. was enrolled in counseling through Grace Haven and was also seeing a doctor for medication related to her mental health issues. Hill stated that if E.E.D. were to be returned to J.L.T., she would be concerned that E.E.D. "would not continue to grow" due to J.L.T.'s denial of E.E.D.'s mental health needs.

{¶ 26} With respect to E.E.D.'s wishes, Hill testified that E.E.D. had informed her that she wants to continue having a relationship with J.L.T. but "absolutely does not want to live with her" and wants to remain in her current foster home. Hill stated that there had been reports of ongoing incidents between E.E.D. at J.L.T. "for some time" prior to agency involvement[4] and that E.E.D. had explained to her that she is "scared" and "doesn't feel safe" in J.L.T.'s home. Hill stated that E.E.D. was "happy" and "very stable" in her current placement and that E.E.D. had told her that she feels safe in her foster home. Hill testified that E.E.D.'s current foster family was interested in providing permanency for E.E.D., i.e., having E.E.D. stay with them until she was 18, but that it was not a foster-to-adopt placement.

{¶ 27} With respect to E.E.D.'s parents, Hill testified that it was her understanding that Mother resided somewhere in Boston. Hill indicated that Mother was not on the case plan because the agency was unable to locate her and was, therefore, unable to assess her for services. She stated that, to her knowledge, Mother had not been engaged with the agency in any way since November 2019 and that Mother's last contact with E.E.D. was a telephone call in October 2021.

{¶ 28} Hill testified that Father had established paternity but had a history of substance abuse. She stated that the agency had referred Father for a substance abuse assessment and requested that he submit to random drug screens, but that Father did not complete the assessment and did not comply with requested drug

---

[4] Hill testified that she had no documentation of any incidents of abuse of E.E.D. by J.L.T. other than the November 2019 incident.

screens. She stated that at some point in 2021, Father began an intensive drug treatment program but left without completing the program. Hill stated that she had interacted with Father once in August 2021 and noted that, at that time, Father had appropriate housing but thereafter lost contact with Father. Hill stated that, to her knowledge, Father was "not engaged with the child at all" and had never indicated that he wanted to regain custody of E.E.D.

{¶ 29} Hill testified that J.L.T.'s son (E.E.D.'s maternal uncle) and his girlfriend were the only other family members who had been actively involved in E.E.D.'s life. Hill stated that they had been investigated by the agency as a possible placement for E.E.D. that but were determined not to be appropriate due to a domestic violence incident in their home.

{¶ 30} Shaeb testified that she began working with E.D.D. in February 2021, following concerns that E.E.D. had been exposed to trafficking when she ran away from her then-foster home in Toledo. Shaeb stated that she met with E.E.D. approximately once a week and that as she slowly earned E.E.D.'s trust, E.E.D. began "opening up to [her] about all sorts of things in life." Shaeb indicated that their sessions focused on issues related to trafficking, ways E.E.D. could protect herself and stay safe, coping skills and tools E.E.D. could use to address anxiety and express her emotions in a healthy way. Shaeb emphasized the importance of being surrounded by "safe adults" and explained that in circumstances like those involving E.E.D., "when there's been a lot of moving around, a lot of adults coming and going out of their life, it's really important to have interaction for a youth to recognize who

is trustworthy and to decide that for their own, and definitely making sure that they feel safe physically, emotionally, socially, mentally, all the way around." Shaeb testified that E.E.D. told her that she wanted to remain in contact with her biological family but that she did not want to live with her biological family. Shaeb indicated that E.E.D. said she feels "safe" in her current foster home and but did not feel safe when living with J.L.T.

{¶ 31} J.L.T. testified that E.E.D. was placed in her custody when E.E.D. was two years old. J.L.T. stated that, at that time, she made a commitment to take E.E.D. for at least a couple of years so that if Mother, J.L.T.'s niece, changed her mind, she could get E.E.D. back. J.L.T. testified that although she encouraged E.E.D.'s parents to visit her, they saw her, at most, a handful of times.

{¶ 32} J.L.T. stated that she first noticed something was wrong with E.E.D. when E.E.D. was three or four years old and she did not provide appropriate responses during conversations. J.L.T. stated that she brought E.E.D. to MetroHealth Medical Center for treatment and that E.E.D. was thereafter referred to a psychologist, then a psychiatrist. J.L.T. testified that E.E.D. was diagnosed as bipolar and that she was first prescribed medication when she was approximately ten years old. She stated that E.E.D. resisted taking her medication but that she required her to do so.

{¶ 33} J.L.T. testified that around age 13, E.E.D. began having "many problems" at school, e.g., skipping school, refusing to wear her uniform, fighting, aggressive behavior and school suspensions. J.L.T. stated that, at times, she

disciplined E.E.D. due to her behavior and that she had asked for help with E.E.D. from Father and the school. J.L.T. testified that she loved and counseled E.E.D. and gave E.E.D. what she needed.

{¶ 34} J.L.T. acknowledged that there was increasing conflict between her and E.E.D. as E.E.D. got older and for which she sought treatment for E.E.D. She stated that E.E.D. "would call the police all the time" and "would just open the door and say help, help, help." J.L.T. denied that she "got physical" with E.E.D. but stated that when she was angry or frustrated with E.E.D., "[i]t's just some things I do say verbally."

{¶ 35} J.L.T. testified that after E.E.D. was removed from her care, J.L.T. had no contact with E.E.D. for 13 months. She stated that after the no-contact order was lifted, she had three visits and three telephone calls with E.D.D. J.L.T. testified that she repeatedly requested that she be permitted to engage in family counseling with E.E.D. but that the agency denied her requests. J.L.T. indicated that she was not promptly informed that E.E.D. had run away from her foster placement and had been potentially exposed to trafficking and that although she knows E.E.D. has "some mental issues" for which she takes medication, she had not been permitted to communicate with E.E.D.'s doctors or counselors to obtain specific information regarding E.E.D.'s condition. J.L.T. testified that she was worried about E.E.D.'s well-being given that she had previously escaped from foster placements. She stated that she wanted "to have the opportunity to have [E.E.D.] back in my home" and that she believed that "with professional help we could work through this."

{¶ 36} J.L.T. testified that her recent communications with E.E.D. had been going well, that E.E.D. calls her and they talk about school and other things and they have "started to have the same kind of good relationship we had before, the trust we have for each other." J.L.T. stated that she believed their relationship would grow if she was able to maintain contact with E.E.D. She stated that E.E.D. called her in December 2021 and that they had arranged to meet at the McDonald's where E.E.D. worked. J.L.T. indicated that they met for approximately half an hour and that E.E.D. seemed "happy" and "talkative," "[l]ike she has worked things through."

**The Guardian Ad Litem's Report and Recommendation**

{¶ 37} On November 10, 2021, the guardian ad litem filed a written report and recommendation in which he recommended that E.E.D. be placed in the permanent custody of the agency. The guardian ad litem reported that his recommendation was based on meetings or interviews with E.E.D., J.L.T., CCDCFS social workers, Father, E.E.D.'s aunt, E.E.D.'s foster family and staff members at the Village Network. At the permanent custody hearing, the guardian ad litem informed the juvenile court that there was nothing he had learned since the time he filed his report to alter his permanent custody recommendation.

{¶ 38} The guardian ad litem reported that E.E.D. has been "very clear" that she does not want to be reunified with J.L.T. or any other family members and that she wishes to continue in the care of the agency.

{¶ 39} The guardian ad litem reported that E.E.D. was currently on medication for anxiety, depression and PTSD and was taking her medication. He

further reported that E.E.D. was doing well in her current foster placement, e.g., she was going to school every day, had made some friends, had gotten a job and was following the rules of the foster home and getting along with other children in the home. the guardian ad litem stated that although E.E.D. had a history of self-harm, that there were no current reports of such behavior. The guardian ad litem indicated that E.E.D. appeared "happier now than at any time during this case."

{¶ 40} The guardian ad litem acknowledged that J.L.T. was never given an opportunity to engage in family therapy with E.E.D. due to the "unique situations" in the case, including the no-contact order, COVID restrictions and E.E.D.'s mental health issues. He further acknowledged that, for these reasons, he was unable to observe any interaction between J.L.T. and E.E.D.

{¶ 41} The guardian ad litem reported that J.L.T.'s home was appropriate and that he believed J.L.T. "truly cares" for E.E.D. and wanted to maintain legal custody of her, but that the relationship between J.L.T. and E.E.D. had "never progressed" to a point where a return to J.L.T.'s care could be reasonably considered. He stated that it was unknown whether J.L.T. would be able to manage E.E.D.'s mental health and behavior issues or if she had learned more effective ways to redirect E.E.D.'s behavior.

**The Juvenile Court's Decision to Grant Permanent Custody of E.E.D. to CCDCFS**

{¶ 42} Following consideration of the evidence presented at the permanent custody hearing and the recommendation of the guardian ad litem, the juvenile court granted the agency's motion for permanent custody, terminated the parental rights of Mother and Father and terminated the rights of J.L.T. as legal custodian.

{¶ 43} On February 14, 2022, the juvenile court issued a written journal entry, setting forth its findings (the "permanent custody order"). The juvenile court found, by clear and convincing evidence, that E.E.D. had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period, that pursuant to R.C. 2151.414(E)(1), (4) and (10), E.E.D. could not be placed with either parent within a reasonable time or should not be placed with either parent and that it was E.E.D's best interest that permanent custody be granted to the agency.

{¶ 44} As it relates to J.L.T. and her request to maintain legal custody of E.E.D., the juvenile court found:

> [E.E.D.] is fifteen years old. She was the victim of criminal charges perpetrated against her by her legal custodian. * * * [T]he legal custodian was convicted of domestic violence and endangering children. *See* CCDCFS Exhibit 4.

> A no-contact order was in place for [E.E.D.], the victim, from January to October of 2020. *See*, CCDCFS Exhibits 3 and 4.

> When the no contact order was lifted by the judge presiding over the legal custodian's criminal case, an in-person visit was attempted by the agency. The visit did not go well. When the social worker arrived, the child was crying and walking outside the building where the visit was to occur. The visit was essentially over before it could even get started.

The agency has not been able to implement any family counseling because both the child and her counselor have been very clear that the child is not ready for family counseling, and it would not be in her best interest. *See*, Legal Custodian's Exhibit A.

The argument of the legal custodian is that the child should have been, or should be, forced to undergo family counseling with the person who was convicted of hurting her. The legal custodian was convicted of domestic violence and child endangering against [E.E.D.]. The Court finds that it is not in the child's best interest for her to be able to dictate the terms of a relationship with her victim, [E.E.D.], against that victim's will and against the advice of [E.E.D.'s] mental health provider.

The Court notes that the testimony of the legal custodian in response to certain questions was concerning. Moreover, pursuant to R.C. 2151.414(C), the Court shall not consider the effect the granting of permanent custody would have upon the parent, or in this case, the legal custodian.

The child's GAL is also her attorney. He strongly recommends permanent custody as being in the child's best interest and that there is no conflict between his recommendation and [E.E.D.'s] wishes.

Over the course of this case, the child has had many struggles. She has been in residential treatment for severe mental health problems and was absent without leave placing her at risk of further criminal victimization.

Now, [E.E.D.] is doing well. She has a job, a savings account, good grades, and is comfortable with her foster family. She has had contact with her legal custodian and is interested in having a relationship with other members of her biological family. But the testimony clearly and convincingly established that she needs to be able to set the terms of that contact from a safe place for her.

[E.E.D.] has been in the custody of CCDCFS for over two years. The child, her GAL and CCDCFS are all asking for permanency in this matter. The Court cannot order immediate reunification with the legal custodian without upending the child's progress and gravely risking her mental and emotional health, and further extensions of temporary custody are not in the child's best interest.

The issue before the court is not whether fifteen-year-old [E.E.D.] will have a relationship with her biological family as she is clearly capable

of reaching out to them, and has begun so doing. The issue before the court is her legal status with the agency, and whether she will be able to continue to grow into a healthy adulthood in her current situation in which she is making so much progress.

{¶ 45} J.L.T. appealed,[5] raising the following two assignments of error for review:

First Assignment of Error
The trial court's order granting permanent custody is against the manifest weight of the evidence.

Second Assignment of Error
The trial court erred in denying the legal custodian's motion for legal custody and finding that the termination of parental rights are in the best interest of the minor child.

## Law and Analysis

### Standing

{¶ 46} Before we consider the merits of this appeal, the state has raised an issue of standing. "Standing to appeal is a jurisdictional prerequisite and only aggrieved parties have standing to appeal." *In re An.M.*, 8th Dist. Cuyahoga No. 111368, 2022-Ohio-2873, ¶ 23, citing *Goodman v. Hanseman*, 132 Ohio St.3d 23, 2012-Ohio-1587, 967 N.E.2d 1217, 1218, ¶ 1. "'Generally, a party cannot appeal an alleged violation of another party's rights.'" *In re Th.W.*, 8th Dist. Cuyahoga Nos. 85241 and 85278, 2005-Ohio-2852, ¶ 13, quoting *In re Mourey*, 4th Dist. Athens No. 02CA48, 2003-Ohio-1870, ¶ 20.

---

[5] Mother and Father have not appealed the termination of their parental rights.

{¶ 47} The state asserts that because J.L.T. is not a parent of E.E.D., she lacks standing to appeal the juvenile court's February 14, 2022 permanent custody order and her appeal should, therefore, be dismissed. We disagree.

{¶ 48} J.L.T. was granted legal custody of E.E.D. by court order in 2010. R.C. 2151.011(B)(21) defines "[l]egal custody" as "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." Thus, as E.E.D.'s legal custodian, J.L.T. had rights as the child's legally recognized caretaker, which were subject only to the residual rights of E.E.D.'s parents. Legal custody is intended to be permanent. *See* R.C. 2151.42(B) ("An order of disposition issued under [R.C. 2151.353(A)(3), R.C. 2151.415(A)(3), or R.C. 2151.417] granting legal custody of a child to a person is intended to be permanent in nature."); *see also In re A.P.*, 9th Dist. Medina No. 12CA0022-M, 2012-Ohio-3873, ¶ 17-35 (where agency did not seek to terminate or modify prior legal custody order under R.C. 2151.42(B), grandmother did not lose her status as child's "custodian" as it related to reunification and case plan efforts when the juvenile court later placed the child in the temporary custody of the agency).

{¶ 49} The juvenile court's February 14, 2022 permanent custody order not only terminated Mother's and Father's parental rights but also expressly terminated J.L.T.'s rights as legal custodian of E.E.D., denying her the right to maintain legal

custody of E.E.D. Although J.L.T., as a nonparent former legal custodian, lacks standing to challenge the juvenile court's permanent custody order to the extent it terminates Mother's and Father's parental rights, *see, e.g., In re Ez.D.*, 8th Dist. Cuyahoga No. 110447, 2021-Ohio-3041, ¶ 16-17, J.L.T. has standing to challenge the permanent custody order as it relates to her request to maintain legal custody of E.E.D. and the termination of her rights as legal custodian. *See, e.g., In re C & C*, 1st Dist. Hamilton No. C-220358, 2022-Ohio-3751, ¶ 21, citing *In re T.M.*, 1st Dist. Hamilton No. C-210480, 2021 Ohio App. LEXIS 4454, 7 (Dec. 22, 2021). Accordingly, our review of the permanent custody order is limited to the denial of J.L.T.'s request to maintain legal custody of E.E.D. and the termination of her rights as legal custodian.

**Failure to Comply with R.C. 2151.414**

{¶ 50} In her first assignment of error, J.L.T. argues that the trial court failed to comply with R.C. 2151.414 in granting permanent custody to CCDCFS because its factual findings are not supported by clear and convincing evidence.

{¶ 51} Once an agency has filed a motion requesting permanent custody of a child pursuant to R.C. 2151.413(A), "'R.C. 2151.414 sets forth the procedures a juvenile court must follow and the findings it must make before granting [the] motion.'" *In re CF.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 22, quoting *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 9.

{¶ 52} R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody. A juvenile

court may grant a public child services agency's motion for permanent custody if it determines, by clear and convincing evidence, that (1) permanent custody is in the best interest of the child and (2) any of the following applies:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 53} Here the trial court found that R.C. 2151.414(B)(1)(d) applied. J.L.T. does not dispute that the juvenile court made the requisite findings under R.C. 2151.414(B)(1). Rather, she contends that the juvenile court violated R.C. 2151.414

in granting permanent custody to the agency because its factual findings were not supported by clear and convincing evidence. She also contends — without citation to any supporting authority — that although "mathematically" speaking, the juvenile court "correctly determined" that E.E.D. had been in agency custody "for the magical 12 out of 22 months," this "mathematical determination" did not take into account the "lack of progress" and "delays in referral for services" caused by the pandemic and that, therefore, "the meeting of the statutory timeframe should not be given the weight typically associated in a review of the factors set forth in R.C. 2151.414(B)(1)(a)-(e)" when "determining whether the first prong of the statutory factors were met."

{¶ 54} "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08 and 3-17-09, 2018-Ohio-125, ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26. It applies to parents and identifies the circumstances in which parents may be permanently divested of their parental rights. *In re M.C.*, 5th Dist. Stark No. 2020CA00049, 2020-Ohio-4372, ¶ 36. J.L.T. is not E.E.D.'s parent. She is E.E.D.'s great-aunt and former legal custodian. As such, she is not entitled to the same protections as E.E.D.'s parents. *See, e.g., In re M.H.*, 5th Dist. Muskingum No. CT2015-0061, 2016-Ohio-1509, ¶ 31 ("Relatives seeking custody of a child are not afforded the same presumptive legal rights that a parent receives."); *In re L & M Children*, 1st Dist. Hamilton Nos. C-180598, C-180628 and C-180629, 2019 Ohio App. LEXIS 689, 21 (Feb. 22, 2019)

("Relatives seeking custody of a child do not have the same rights as natural parents."), citing *In re C.H.*, 8th Dist. Cuyahoga No. 103171, 2016-Ohio-26, ¶ 27.

{¶ 55} Although J.L.T. asserts in her appellate brief that "parents," as used in R.C. 2151.414, "would include any relative from whom custody was removed," she, once again, cites no legal authority in support of this proposition. However, as the Fifth District explained in *In re M.C.*:

> R.C. 2151.414 applies to parents and the prospect of permanently divesting parents of their parental rights. Appellant is not [the child's]s parent, but rather his maternal grandmother and was his legal custodian. * * *
>
> Once legal custody is granted, the child's home is the home of the legal custodian. * * * "While there has been some modern trend to liberally define family and to bestow certain rights to extended family, *see, e.g., Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165 (grandparent visitation), we have found no authority * * * which grants to an unrelated individual the unique status occupied by biological parents or their legal equivalent, adoptive parents. It is only these upon whom constitutional protection is invested and, in Ohio, the strictures of R.C. 2151.414 adhere."

*In re M.C.* at ¶ 36-37, quoting *In the matter of Kenny B., Jr.*, 6th Dist. Lucas No. L-05-1227, 2006-Ohio-968, ¶ 15, 17-18 (rejecting argument by child's prior legal custodian that he "should be afforded the same procedural protection as a natural parent, including satisfaction of the R.C. 2151.414 requirements for termination of parental rights"); *see also In re Benavides*, 8th Dist. Cuyahoga No. 78204, 2001 Ohio App. LEXIS 2002, 14 (May 3, 2001) (noting that although "the court should look to R.C. 2151.414 (E) for guidance when considering a grandparent's desire to retain custody of grandchildren, * * * the trial court is not required to make its determination based upon the standard of clear and convincing evidence").

**{¶ 56}** Accordingly, we overrule J.L.T.'s first assignment of error.

**Best-Interest Determination**

**{¶ 57}** J.L.T. also challenges the juvenile court's best-interest determination. She argues that the juvenile court abused its discretion in determining that permanent custody was in E.E.D.'s best interest "without credible and competent [evidence] to support [that] decision."

**{¶ 58}** Although J.L.T.'s second assignment of error is phrased as challenging both the trial court's decision on legal custody[6] and its termination of Mother's and Father's parental rights, in her brief, J.L.T. presents arguments addressing the juvenile court's best-interest determination only as it relates to the termination of Mother's and Father's parental rights, not as it relates to the juvenile

---

[6] In her second assignment of error, J.L.T. asserts that "[t]he trial court erred *in denying the legal custodian's motion for legal custody* and finding that the termination of parental rights are in the best interest of the minor child." (Emphasis added.) J.L.T., however, did not file a motion for legal custody in this case. Citing R.C. 2151.353(A)(3), the agency argues that because J.L.T. did not file a motion for legal custody in this case, she failed to preserve her right to maintain legal custody of E.E.D. and the juvenile court was precluded, as a matter of law, from granting her request for continued legal custody of E.E.D. However, as noted above, J.L.T. was granted legal custody of E.E.D. in 2010 in Cuyahoga C.P. Juv. No. CU09118219. There is nothing in the record to suggest that, prior to the juvenile court's February 14, 2022 permanent custody — which explicitly terminated J.L.T.'s rights as legal custodian of E.E.D. — J.L.T. had permanently lost her status as E.E.D.'s legal custodian. The agency did not file a motion under R.C. 2151.353(F)(2) or 2151.42(B) to modify or terminate J.L.T.'s legal custody of E.E.D. Although the record in Cuyahoga C.P. Juv. No. CU09118219 is not part of the record in this case, given that R.C. 2151.353(A)(3) requires that a person to whom legal custody is awarded file a motion requesting legal custody and/or sign a statement of understanding for legal custody, presumably J.L.T. complied with that requirement before being awarded legal custody of E.E.D. in Cuyahoga C.P. Juv. No. CU09118219 in 2010. Under the circumstances, it seems illogical that J.L.T., as legal custodian, would need to file another motion for legal custody to preserve her right to continue as E.E.D.'s legal custodian in this case. Nevertheless, because the issue is not determinative, we need not resolve it here.

court's ruling on legal custody. *See, e.g.,* Appellant's Br. at 15 ("The determination that the child's best interest were served by a termination of parental rights is herein challenged."). In her brief, J.L.T. does not identify the standard applicable to decisions regarding legal custody and does not cite any legal authority relating to such decisions. This distinction is significant because, as stated above, although J.L.T. has standing to challenge the juvenile court's termination of her rights as legal custodian of E.E.D., she has no standing to challenge the termination of Mother's and Father's parental rights. *See, e.g., In re Ez.D.*, 2021-Ohio-3041, at ¶ 16-17 (grandmother who was former legal custodian lacked standing to challenge permanent custody order terminating parents' parental rights); *In re C & C*, 2022-Ohio-3751, at ¶ 21 (although grandmother had no standing to appeal the juvenile court's award of permanent custody, she had standing to appeal the denial of her request for legal custody). Accordingly, for this reason alone we could overrule J.L.T.'s second assignment of error. *See* App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it fails * * * to argue the assignment separately in the brief, as required under App.R. 16(A)."); App.R. 16(A)(7) ("The appellant shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.").

{¶ 59} We acknowledge, however, where, as here, a juvenile court's decision involves rulings on both legal custody and permanent custody, its best-interest

determinations are often intertwined. *See, e.g., In re C.T.*, 8th Dist. Cuyahoga No. 110303, 2021-Ohio-2274, ¶ 82 ("'[I]f permanent custody to the agency is in [a child's] best interest, legal custody to [a relative] necessarily is not.'"), quoting *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061 and 103367, 2015-Ohio-4991, ¶ 61; *In re T.M.*, 9th Dist. Wayne No. 13CA0043, 2014-Ohio-1131, ¶ 17 ("Because the trial court's decision to deny Grandmother's motion for legal custody hinges on the best interest of the child, this Court 'typically conducts a single "best interest" review of the trial court's decision to place the child in the permanent custody of the agency rather than in the legal custody to a relative.'"), quoting *In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10.

{¶ 60} Even if we were to construe J.L.T.'s challenge to the juvenile court's best-interest determination as a challenge to the trial court's ruling on legal custody as opposed to a challenge to the juvenile court's termination of Mother's and Father's parental rights, we would find no reversible error here.

**Legal Custody**

{¶ 61} The touchstone of a decision regarding legal custody is the best interest of the child. *See, e.g., In re C.S*, 3d Dist. Paulding No. 11-21-07, 2022-Ohio-2451, ¶ 20 ("At a dispositional hearing involving a request for legal custody, the focus is on the best interest of the child."); *In re A.P.*, 9th Dist. Summit No. 30056, 2022-Ohio-276, ¶ 7 ("'Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child.'"), quoting *In re*

*K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12; *In re A.C.*, 8th Dist. Cuyahoga No. 108442, 2019-Ohio-5127, ¶ 15 ("'[W]hen a juvenile court awards legal custody following an adjudication of abuse, neglect, or dependency, it does so by examining what would be in the best interest of the child based on preponderance of the evidence.'"), quoting *In re T.R.*, 8th Dist. Cuyahoga No. 102071, 2015-Ohio-4177, ¶ 44; *see also* R.C. 2151.42(B) ("A court shall not modify or terminate an order granting legal custody of a child unless it finds, based on facts that have arisen since the order was issued or that were unknown to the court at that time, that a change has occurred in the circumstances of the child or the person who was granted legal custody, and that modification or termination of the order is necessary to serve the best interest of the child.").[7]

{¶ 62} When considering legal custody as a dispositional alternative following an adjudication of abuse, neglect or dependency, there is no "specific test or set of criteria" that must be applied to determine what is in a child's best interest. *In re S.G.*, 8th Dist. Cuyahoga No. 108711, 2020-Ohio-4060, ¶ 24; *In re C.D.Y.*, 8th Dist. Cuyahoga No. 108355, 2019-Ohio-4987, ¶ 10. Nevertheless, best-interest

_____

[7] The parties do not address R.C. 2151.42(B) in their appellate briefs. Because J.L.T. has not argued on appeal that the juvenile court was required to comply, and failed to comply, with R.C. 2151.42(B) in terminating her rights as legal custodian of E.E.D., we do not address that issue here. *But see In re C.D.Y.*, 8th Dist. Cuyahoga No. 108355, 2019-Ohio-4987, ¶ 26, fn. 2 ("Legal custody may be modified or terminated only by following the procedures identified in R.C. 2151.42."); *In re L.H.*, 8th Dist. Cuyahoga No. 97977, 2012-Ohio-4062, ¶ 14-21 ("In the absence of compliance with R.C. 2151.42(B), * * * the trial court abused its discretion by adopting the magistrate's decision that purported to terminate [appellant's] legal custodianship and remove her as a party.").

factors relating to permanent custody set forth in R.C. 2151.414(D)(1) may be "instructive" in making that determination. *See, e.g., In re V.P.*, 8th Dist. Cuyahoga No. 109649, 2020-Ohio-5626, ¶ 32; *see also In re B.D.,* 8th Dist. Cuyahoga No. 105650, 2017-Ohio-8663, ¶ 26 ("In determining the best interest of the child in a legal custody case, the juvenile court should consider all relevant factors, and may look to the factors listed under R.C. 2151.414(D) * * * for guidance."), citing *In re M.B.*, 8th Dist. Cuyahoga No. 105168, 2017-Ohio-7481, ¶ 11.  These factors include:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custody history of the child * * *;

> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 63} A court may also look to the best-interest factors set forth in R.C. 3109.04(F)(1) in determining what is in a child's best interest for purposes of a legal custody determination.  *In re C.D.Y.* at ¶ 12.  Relevant to the issues in this appeal, those factors include:

> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

> (d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation[.]

R.C. 3109.04(F)(1).

{¶ 64} Appellate courts review a dispositional order that awards, modifies or terminates legal custody for abuse of discretion. *See, e.g., In re C.D.Y.* at ¶ 8; *In re T.J.*, 10th Dist. Franklin Nos. 10AP-201 and 10AP-202, 2010-Ohio-4191, ¶ 14. An abuse of discretion occurs when a juvenile court's decision is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). A decision is unreasonable if there is "'no sound reasoning process that would support that decision.'" *In re C.D.Y.* at ¶ 8, quoting *Baxter v. Thomas*, 8th Dist. Cuyahoga No. 101186, 2015-Ohio-2148, ¶ 21. A decision is arbitrary if it is made "'without consideration of or regard for facts [or] circumstances.'" *In re C.D.Y.* at ¶ 8, quoting *Black's Law Dictionary* 125 (10th Ed.2014). Thus, a juvenile court abuses its discretion if competent, credible evidence does not support the juvenile court's decision regarding the child's best interest. *See, e.g., In re E.R.M.*, 1st Dist. Hamilton No. C-190391, 2020-Ohio-2806, ¶ 12.

{¶ 65} J.L.T. argues that "a review of the testimony and evidence at trial do not support" the juvenile court's determination that permanent custody was in E.E.D.'s best interest. She asserts that "[i]n the absence of evidence of ongoing abuse or neglect, safety concerns for the minor child or other facts that make reunification impossible, every effort to keep children and their families together should be made." She contends that the juvenile court abused its discretion in determining

that permanent custody was in E.E.D.'s best interest because it gave undue weight to the wishes of "a mentally ill minor child who has needed years of past counseling and services" and "ignored" certain other facts, including J.L.T.'s "genuine desire" to have E.E.D. returned to her care, her "repeated efforts to participate in services," her "wish to engage in counseling to address the past conflict" and the agency's denial of services and visitation, in determining what was in E.E.D's best interest. J.LT.'s arguments are meritless.

{¶ 66} A child's "best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 11, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991). The record reflects that the juvenile court considered each of the relevant best-interest factors set forth in R.C. 2151.414(D)(1)(a)-(d) and 3109.04(F)(1)(c)-(e) (as well as other relevant factors) in determining what was in E.E.D.'s best interest. As detailed above, the juvenile court set forth specific findings explaining its evaluation of each of these factors and its conclusion that an award of permanent custody to the agency, rather than a continuation of legal custody with J.L.T., was in E.E.D.'s best interest. While under J.L.T.'s care, E.E.D. was struggling with mental health issues, was missing school and there was significant conflict in the home, ultimately leading to J.L.T.'s convictions for domestic abuse and child endangering. In her current placement, E.E.D. feels safe, is doing well in school, has a job, is behaving appropriately at

school and at home and her mental health issues are managed with the assistance of counseling and medication.

{¶ 67} At the time of the permanent custody hearing, E.E.D. was 15. Based on the evidence presented at the hearing and the report of the guardian ad litem, E.E.D. demonstrated sufficient maturity to meaningfully express her wishes regarding placement. The record reflects that E.E.D. had repeatedly and consistently stated — to the CCDCFS caseworker, to her counselor, to her guardian ad litem and to J.L.T. — that although she wished to maintain a relationship with J.L.T. and other members of her biological family, she did not want to live with them and, instead, wanted to be placed in the permanent custody of the agency. The witnesses testified that E.E.D. had indicated that she desired to be placed in permanent custody because she felt comfortable and safe in her current placement and did not feel safe when living with J.L.T. E.E.D.'s wishes were consistent with the recommendation of her guardian ad litem.

{¶ 68} Although J.L.T. was not given the opportunity to participate in family counseling with E.E.D. to attempt to complete her case plan objectives, the juvenile court reasonably determined that where, as here, the child's legal custodian was convicted of committing domestic violence and child endangering against the child and both the child and her counselor had been very clear that the child is not ready for family counseling, E.E.D. should not have been forced to undergo family counseling with J.L.T. against her will and against the advice of her mental health provider. The juvenile court likewise reasonably determined that permanency for

E.E.D. should not be further delayed in the hope that, at some time in the future, E.E.D. might be ready to engage in counseling with J.L.T.

{¶ 69} Despite J.L.T.'s assertions to the contrary, a juvenile court is not required to favor legal custody with a relative if, after considering the relevant factors, it is in the child's best interest for the agency to be granted permanent custody. *See, e.g., In re M.S.*, 2015-Ohio-1028, at ¶ 11, citing *In the Matter of B.H.*, 5th Dist. Fairfield No. 14-CA-53, 2014-Ohio-5790, ¶ 72; *see also In re T.M.*, 1st Dist. Hamilton No. C-210480, 2021 Ohio App. LEXIS 4454, 13 (Dec. 22, 2001) (in determining what was in child's best interest, "juvenile court was not required to place preference on grandmother's familial relationship and award her legal custody" of child); *In re V.C.*, 2015-Ohio-4991, at ¶ 61 ("The willingness of a relative to care for a child does not alter what a court considers in determining whether to grant permanent custody.").

{¶ 70} Although J.L.T. and E.E.D. appear to share a genuine affection for one another, we cannot say, based on the record before us, that the juvenile court abused its discretion in determining that it was in E.E.D.'s best interest that she not be returned to the legal custody of J.L.T. The juvenile court's decision was well reasoned, was not arbitrary or unconscionable and the juvenile court's findings are supported by ample, competent and credible evidence in the record.

{¶ 71} Accordingly, we overrule J.L.T.'s second assignment of error.

{¶ 72} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR