[Cite as *In re K.S.*, 2025-Ohio-4773.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

IN RE: K.S. AND K.S.

:
:    C.A. No. 2025-CA-28
:
:
:    Trial Court Case No. 2019-516; 2019-
:    517
:
:    (Appeal from Common Pleas Court-
:    Juvenile Division)
:
:    **FINAL JUDGMENT ENTRY &**
    **OPINION**

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on October 17, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Christopher B. Epley*

_____
CHRISTOPHER B. EPLEY, PRESIDING JUDGE

TUCKER, J., and HUFFMAN, J., concur.

KELLY M. SCHROEDER, Attorney for Appellant
CHRISTOPHER P. LANESE, Attorney for Appellee Clark County Department of Job and Family Services
STEVEN H. ECKSTEIN, Attorney for Appellee Courtney Barker

EPLEY, P.J.

{¶ 1} Appellant Kimberly Chance, former legal custodian of K.S. and K.S., appeals from the judgment of the Clark County Court of Common Pleas, Domestic Relations Division, Juvenile Section, after it granted permanent custody of the children to the Clark County Department of Job and Family Services ("JFS"). For the reasons that follow, the judgment of the trial court is affirmed.

## I.      Facts and Procedural History

{¶ 2} Twins, K.S. and K.S., were born on November 28, 2018 to Mother and Father, neither of whom are parties to this appeal. JFS, which had previously been involved with Mother and her other children, re-engaged in March 2019 after police officers were dispatched to their home and found it full of trash, dirty dishes, and moldy food. Both twins were hospitalized that month due to malnutrition. Mother was soon charged with three counts of child endangering.

{¶ 3} On June 19, 2019, concerned that Mother's custody of the twins was jeopardizing their health, JFS filed a request for a shelter care order and temporary custody. K.S. and K.S. were placed in the temporary custody of Kimberly (f.k.a. Kimberly Barker) and Courtney Barker ("Barker"), acquaintances of Mother and a married couple at the time. The Barkers were granted legal custody of the boys and their older sister, F.S., on August 5, 2020.

2

{¶ 4} In January 2023, F.S. was moved to a relative's home after she alleged sexual abuse by Barker. On March 15, 2023, JFS filed for interim temporary custody of the twins after it learned that Barker was under investigation for sexually abusing F.S. in the home. In the emergency motion, JFS informed the magistrate that Kimberly reported that after Barker's March 3 interview with Springfield P.D., he came home, went into their bedroom, and told her that "the interview did not go well, and he just needed to put a bullet in his head." March 15, 2023 Emergency Motion. According to Kimberly, Barker retrieved a gun from his safe and put it to his head; she was able to stop him before he pulled the trigger. Kimberly called the police and when they arrived, she surrendered all their firearms and ammunition. Barker was taken to the hospital for a mental health evaluation.

{¶ 5} The day Barker was released from the mental health institution, a JFS supervisor texted Kimberly asking if she had a plan. Kimberly responded that "[Barker] needed to be home with her and the boys. There was nowhere for any of them to stay apart and for Mr. Barker's recovery, they needed to be in one home and [K.S. and K.S.] needed to stay with them." March 15, 2023 Emergency Motion.

{¶ 6} Finding that it was no longer in the twins' best interest to stay in the Barker home, on March 15, 2023, the magistrate removed K.S. and K.S. from their care and ordered that the children be placed in the interim temporary custody of JFS. Upon removal from the home, the twins disclosed additional alleged sexual abuse incidents. On March 29, the court instituted a no-contact order, preventing the Barkers from communicating with the twins during the investigation.

{¶ 7} On June 20, 2023, Barker was convicted of rape and sentenced to an indefinite term of 10 years to life in prison. Kimberly ended her marriage with Barker soon thereafter.

{¶ 8} Over the course of the next two years, the agency filed two extensions for temporary custody. During that time, K.S. and K.S. went through several foster placements due to behavioral issues. Additionally, the boys made multiple disclosures to various individuals alleging that Barker sexually abused them, too, though they were perhaps unaware of the severity of Barker's actions. By 2025, one of the boys began exhibiting inappropriate sexual behaviors towards others, including minors.

{¶ 9} JFS filed for permanent custody of the twins on December 18, 2024. A trial was scheduled for March 10, 2025, but before testimony was heard at the trial, Mother voluntarily relinquished her parental rights to K.S. and K.S., agreeing that it was in their best interest for the agency to have permanent custody. The trial proceeded, though, because Kimberly, who was still the children's legal custodian—despite not having had contact with the children in years—objected to JFS receiving permanent custody instead of her. She was, however, *not* present at the trial.

{¶ 10} Bridget Tharp, the foster mother of K.S. and K.S., testified at the trial. She told the court that the boys had been in her care for about eight months and things had been going well. According to her, both children were in therapy, and both had "specialized sexual behavioral counselors" that they met with to address those concerns because the "sexualized behaviors" were still frequent. Bridget told the court that K.S. and K.S. participated in activities such as T-Ball, Boy Scouts, and piano, and they were doing "exceptionally well" in kindergarten. Importantly, she revealed that she wanted to adopt the boys.

{¶ 11} The other witness to testify was Tori Lemaster, the JFS case supervisor. She explained how Kimberly had become involved with the twins. Kimberly had been a home healthcare aid for Mother's mother, and the two became friends. Lemaster described the

4

process that had led the children to be removed from Kimberly's care after Courtney Barker was charged with the rape of their older sister. Lemaster stated that the agency believed it was in the twins' best interests to be placed in the permanent custody of JFS and that they should have no relationship with Kimberly.

{¶ 12} After considering the trial testimony and the parties' written closing arguments, the trial court granted permanent custody to JFS. The court found that K.S. and K.S. had been in the temporary custody of the agency for 12 or more months of a 22-month period and that the commitment of the children to the permanent custody of JFS was in their best interest. Mother and Father were divested of their parental rights, and the former order of legal custody to Kimberly and Courtney Barker was terminated.

{¶ 13} Kimberly has appealed.

## II.    Permanent Custody

{¶ 14} In her assignment of error, Kimberly argues that the trial court erred in granting permanent custody to JFS because it was not in the children's best interests.

<u>Legal Custody</u>

{¶ 15} Before we analyze the merits of the trial court's grant of permanent custody to JFS, we must decide if Kimberly, as the former legal custodian of K.S. and K.S., has standing to challenge the trial court's judgment. R.C. 2151.011(B)(21) defines "legal custody" as "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." A grant of legal custody is intended to be permanent. *See* R.C. 2151.42(B).

5

{¶ 16} The March 24, 2025 order granting permanent custody to JFS terminated Mother's parental rights, as well as Kimberly's rights as legal custodian of K.S. and K.S. Thus, while Kimberly lacks the ability to challenge the trial court's permanent custody order as to Mother's parental rights, she does have standing to challenge the order as it relates to her request to keep legal custody of the twins and the termination of her rights as custodian. *See In re E.E.D.*, 2022-Ohio-4014, ¶ 48-49 (8th Dist.).

Permanent Custody

{¶ 17} R.C. 2151.414 sets forth a two-part analysis for courts to consider when determining a motion for permanent custody to a public services agency. First, the trial court must find that the child either (a) cannot or should not be placed with the parent within a reasonable time; (b) is abandoned; (c) is orphaned with no relatives above to take permanent custody; or (d) has been in the temporary custody of a public or private children services agency for 12 or more months of a consecutive 22-month period. *In re J.N.*, 2020-Ohio-4157, ¶ 26 (2d Dist.); R.C. 2151.414.

{¶ 18} If the first part of the analysis is satisfied, then under the second part of the analysis, the court must determine whether granting permanent custody is in the best interest of the child. *In re J.N.* at ¶ 26; R.C. 2151.414(B)(1). To assist with this determination, R.C. 2151.414(D)(1) sets out factors the court must consider:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child . . .;

6

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

"No one element is given greater weight or heightened significance." *In re C.F.*, 2007-Ohio-1104, ¶ 57.

{¶ 19} While a trial court must make its findings by clear and convincing evidence when it comes to parents, a lesser standard applies to non-parents such as Kimberly. This is because the United States Supreme Court has described parents' interest in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). That same interest is not present for non-biological legal guardians. As the Sixth District has said, "[W]e have found no authority . . . which grants to an unrelated individual the unique status occupied by biological parents or their legal equivalent, adoptive parents. It is only these upon whom constitutional protection is invested and, in Ohio, the strictures of R.C. 2151.414 adhere." *In re Kenny B*, 2006-Ohio-968, ¶ 17 (6th Dist.). *See also In re E.E.D.*, 2022-Ohio-4014, ¶ 55 (8th Dist.). Therefore, we will not disturb the trial court's decision absent an abuse of discretion. *In re Kenny B* at ¶ 18.

{¶ 20} In this case, K.S. and K.S. had been in the custody of JFS from March 15, 2023, until the permanent custody motion was filed on December 18, 2024. This 21-month timeframe was far more than the requisite 12 months of a consecutive 22-month period outlined in R.C. 2151.414(B)(1)(d). The trial court's analysis, therefore, focused on whether the grant of permanent custody to JFS was in the best interest of the twins.

7

{¶ 21} As to the first factor, the interaction and interrelationship of the children with others in their lives, the court found that K.S. and K.S. were bonded to Bridget Tharp, their current foster parent, and that Mother supported Tharp having custody of the children. In addition, Tharp is a certified "therapeutic foster parent," meaning that she has had significant training to help manage behavioral issues, including those demonstrated by the boys. As to the children's interactions with Barker and Kimberly, the court observed that there had been none. Barker is incarcerated, potentially for the rest of his life, after being found guilty of raping the children's older sister, and there had not been contact since early 2023. Similarly, Kimberly had not had contact with K.S. and K.S. in years. The court found it problematic that "she continues to reside and live in that home [in which abuse took place] which could cause serious emotional damage to these children." Decision and Order, p. 4. Furthermore, the trial court noted that Kimberly had not filed a motion for custody and had failed to appear at the permanent custody hearing.

{¶ 22} As for the second factor, the trial court found that the wishes of the children were unknown due to their young ages. However, the GAL's reports consistently indicated a strong bond between the twins and Mother.

{¶ 23} The custodial history of the children was considered. The court recounted that from the age of seven months, K.S. and K.S. had been in the care and custody of someone other than their parents.

{¶ 24} The trial court also considered factors in R.C. 2151.414(E), finding that the parents, Kimberly, and Barker had continuously and repeatedly failed to remedy the conditions that initially caused K.S. and K.S. to be placed outside the home. This section contains a catch-all factor which we believe plays an important part in this case. The court, the GAL, and JFS all shared the concern that Kimberly had failed to protect the twins from

8

sexual abuse. The July 2023 GAL report revealed that the guardian was skeptical that Kimberly was unaware of the sexual abuse that had occurred while she was present in the home, and even if Kimberly was oblivious, "it raises concerns that Mrs. Barker was not actively involved in the children's lives and failed to parent [them]. Regardless, it appears Mrs. Barker failed to protect these children[.]" The August 2024 GAL report noted that the guardian believed that Kimberly not only failed to protect F.S. from Barker, but according to Facebook posts by Kimberly, also blamed the child for her husband's actions. In its decision, the trial court stressed that while Kimberly was never charged in connection to F.S.'s rape, the "concerns remain that she knew or should have known of the ongoing sexual abuse and . . . failed to protect F.S." The court also noted that Kimberly had failed to cooperate with JFS while Barker was being investigated and supported him instead of the victim.

{¶ 25} Further, there appears to be a real possibility that besides failing to protect F.S. from Barker, Kimberly failed to protect K.S. and K.S. from him, too. The record is replete with reports of one or both boys engaging in "sexualized behaviors," actions that six-year-old children would not take under normal circumstances. There is also evidence of other concerns about the Barkers. In addition to the sexual abuse allegations that led to the twins' removal, Tori Lemaster testified that JFS had concerns about the "cleanliness of the home and behaviors that were observed that were deemed to be abusive." Trial Tr. 44. "I believe there were some referrals about hitting." *Id*.

{¶ 26} Despite the evidence in favor of the trial court's decision, Kimberly argues that according to the Ohio Administrative Code, the decision was not in the twins' best interest because "children's services agencies are required to make reasonable efforts to reunify a child with their family, **including a prior legal custodian**, if that custodian had physical and legal custody of the child." (Emphasis in original) Appellant's Br., p. 5. While that may be a

9

true statement, R.C. 2151.419(A)(1) states that "[i]n determining whether reasonable efforts were made, the child's health and safety shall be paramount." Although Barker is incarcerated and not in the picture anymore, based on Kimberly's proven inability to protect the children from harm—both sexual and physical—it was in the best interest of the twins' health and safety not to reunite them with Kimberly.

{¶ 27} Even if that had not been the case, it appears Kimberly did not participate in a reunification plan. A few days after Barker's interview with Springfield Police and suicide attempt on March 3, 2023, a crisis response team meeting was held, and a 30-day care agreement was reached. Kimberly agreed to complete a mental health assessment and to follow through with all recommendations. She also agreed to have visits with the boys at the JFS visitation center. If after 30 days K.S. and K.S. had been unable to return to the Barkers' care, then the agency would have either implemented a safety plan or filed for custody. However, according to JFS's March 15, 2023 emergency motion, Kimberly contacted the agency a week later to state that she was no longer in agreement with the plan.

{¶ 28} Based on the success that K.S. and K.S. were having with their foster mother, who wants to adopt the boys, and the serious concerns surrounding Kimberly, we cannot conclude that the trial court erred when it terminated the former order of legal custody to Kimberly and granted permanent custody to JFS. Under either an abuse of discretion standard or the more exacting clear and convincing evidence standard, the trial court's decision was correct. The assignment of error is overruled.

III.    Conclusion

{¶ 29} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.

10